UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CASE NO. 3:21-CV-330-RGJ
*ELECTRONICALLY FILED*

ANTHONY MATTERA; individually; and on                    PLAINTIFF
behalf of those similarly situated

v.                    **AMENDED CLASS ACTION COMPLAINT**

ROBERT A. BAFFERT; BOB BAFFERT
RACING, INC.; and CHURCHILL
DOWNS, INC.                                              DEFENDANTS

\* \* \* \* \* \* \* \* \*

Comes now the Plaintiff, by counsel, and for his Amended Class Action

Complaint against the Defendants, states as follows:

### INTRODUCTION

This action was originally filed on May 14, 2021 in Jefferson County, Kentucky

Circuit Court. On May 21, 2021, Defendant Churchill Downs Inc. ("CDI") filed a Notice of

Removal, removing this action to the United States District Court for the Western District

of Kentucky. On July 7, 2021, all Defendants filed motions to dismiss under Rule

12(b)(6). This Amended Complaint has been filed on July 28, 2021. Rule 15(a)(1)

provides that "[a] party may amend its pleading once as a matter of course. . .if the

pleading is one to which a responsive pleading is required, 21 days after service of a

responsive pleading or 21 days after service of a motion under Rule 12(b). . .whichever

is earlier." *Id*. Thus, because it is within 21 days after Defendants' motions to dismiss,

this Amended Complaint may be filed as a matter of course.

## PARTIES

1.      On or about May 1, 2021, the Plaintiff, Anthony Mattera ("Mr. Mattera"), was a resident of Florida.

2.      On or about May 1, 2021, Defendant Robert A. Baffert ("Defendant Baffert") was a resident of California.

3.      On or about May 1, 2021, Defendant Bob Baffert Racing, Inc. ("Defendant BBRI") was a California business entity not duly licensed or authorized to do business in the Commonwealth of Kentucky, but was doing business in Kentucky.

4.      On or about May 1, 2021, Defendant Churchill Downs, Inc. ("Defendant CDI") was a Kentucky business entity and was doing business in the Commonwealth of Kentucky.

## JURISDICTION & VENUE

5.      Defendant CDI alleges in its Notice of Removal that this Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d). *Doc*. 1, PageID # 1-4.

6.      If this Court has subject matter jurisdiction, personal jurisdiction exists over the Defendants because each is either domiciled in Kentucky or has had sufficient minimum contacts with Kentucky and with this District as a result of their activities within Kentucky and within this District, and alternatively, because all of the claims alleged in this Amended Complaint arise from their actions occurring within Kentucky and this District.

7.      If this Court has subject matter jurisdiction, venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims stated herein occurred within the District.

2

## FACTUAL AND LEGAL BACKGROUND

8.    The Plaintiff incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows:

### A.  Defendant Baffert's Horse Racing Medication Regulation Violation History and Kentucky Thoroughbred Horse Trainer Regulations

9.    According to an October 23, 2020 article in the Louisville Courier-Journal, "databases maintained by the Association of Racing Commissioners International (ARCI) and the Jockey Club" demonstrate "at least 30 previous medication violations during [Defendant Baffert's] career involving a dozen different drugs."[1]

10.    According to public records from various horse racing commissions in the United Sates, Defendant Baffert's historical medical violations include:

   a.  **August 22, 1977**: Apomorphine administered to an unnamed horse at Sacramento.

   b.  **March 30, 1985**: Excess of phenylbutazone administered to an unnamed horse at an unnamed track in California.

   c.  **March 2, 1986**: Unspecified medication excess administered to an unnamed horse at an unnamed track in California.

   d.  **March 14, 1986**: A second unspecified medication excess administered to an unnamed horse at an unnamed track in California.

   e.  **March 23, 1986**: Unspecified medication excess administered to an unnamed horse at an unnamed track in California.

---

[1] Tim Sullivan, *After another positive, Bob Baffert case will test racing's commitment to drug reform*, Louisville Courier-Journal, Oct. 23, 2020; https://www.courier-journal.com/story/sports/horses/horse-racing/2020/10/23/another-positive-bob-baffert-horse-kentucky-oaks/3741772001/ (last visited May 12, 2021).

f. **August 26, 1987**: Excess of phenylbutazone administered to Tricheng at Hollywood Park.

g. **December 8, 1987**: Excess of phenylbutazone administered to an unnamed horse at an unnamed track in California.

h. **July 9, 1988**: Trimethoprim administered to an unnamed horse at Los Alamitos.

i. **October 5, 1989**: Procaine administered to an unnamed horse at an unnamed track in California.

j. **December 21, 1990**: Lasix security violation at an unnamed track in California.

k. **February 7, 1992**: Glycopyrrolate administered to Gee Marcus at Santa Anita Park.

l. **February 7, 1992**: Glycopyrrolate administered to an unnamed horse at Santa Anita Park.

m. **January 7, 1994**: Phenylbutazone administered to Datsdawayitis at Santa Anita Park.

n. **February 9, 1994**: Phenylbutazone administered to Northern Wool at an unnamed track in California.

o. **May 7, 1998**: Excess phenylbutazone administered to an unnamed horse at Lone Star Park.

p. **June 11, 1998**: Excess phenylbutazone administered to an unnamed horse at Lone Star Park.

q. **August 31, 1998**: No Lasix given to an unnamed horse at Del Mar.

4

r. **June 16, 2001**: Morphine administered to Nautical Look at Hollywood Park.

s. **September 14, 2001**: Dexamethasone administered to Kinshasa at the Los Angeles County Fair (Fairplex).

t. **March 27, 2002**: Phenylbutazone administered to Favorite Funtime at Santa Anita Park.

u. **April 12, 2002**: Phenylbutazone administered to Officer at Santa Anita Park.

v. **March 28, 2003**: Clenbuterol administered to Kafwain at Fair Grounds.

w. **October 13, 2007**:

| Regulatory Authority: **California Horse Racing Board** | | Breed: **Thoroughbred** |
|---|---|---|
| Date: **10/13/2007** | | Fine: **$300.00** |
| Medication 1: **Furosemide** | | Medication 2: |
| Association: **OAK TREE AT SANTA ANITA** | | Suspension Start: |
| Horse: **Stormy Woods** | | Suspension End: |
| Website Updated: | | |

- Description -

Trainer BOB BAFFERT is fined the sum of THREE HUNDRED DOLLARS ($300.00)* pursuant to California Horse Racing Board rule #1629 (Penalty for Late Declaration) for failure to have the horse Stormy Woods treated with Lasix in a timely fashion necessitating a late scratch on Saturday October 13, 2007; a violation of California Horse Racing Board rule #1845 (Authorized Bleeder Medication).

x. **January 7, 2010**:

| Regulatory Authority: **California Horse Racing Board** | Breed: **Thoroughbred** |
|---|---|
| Date: **1/7/2010** | Fine: **$1,000.00** |
| Medication 1: **Flunixin** | Medication 2: |
| Association: **SANTA ANITA PARK** | Suspension Start: |
| Horse: **Mother Ruth** | Suspension End: |
| Website Updated: **4/30/2019** | |

- Description -

Trainer ROBERT BOB BAFFERT, who started the horse Mother Ruth, the fifth place finisher in the third race at Santa Anita Race Track on January 7, 2010, is fined ONE THOUSAND DOLLARS ($1,000.00)* pursuant to California Horse Racing Board rule #1887 (Trainer to Insure Condition of Horse) for violation of California Horse Racing Board rule #1844 (c) (2) (Authorized Medication Flunixin in excess of permitted level 1st offense).

y. **October 23, 2016**:

| Regulatory Authority: **California Horse Racing Board** | Breed: **Thoroughbred** |
|---|---|
| Date: **10/23/2016** | Fine: **$250.00** |
| Medication 1: **Phenylbutazone** | Medication 2: |
| Association: **SANTA ANITA PARK** | Suspension Start: |
| Horse: **American Gal** | Suspension End: |
| Website Updated: **4/30/2019** | |

- Description -

Trainer ROBERT BAFFERT, who started the horse AMERICAN GAL which finished first in the third race at Santa Anita Race Track on October 23, 2016 is fined TWO HUNDRED FIFTY DOLLARS ($250.00)* pursuant to California Horse Racing Board rule #1887 (Trainer to Insure Condition of Horse) for violation of California Horse Racing Board rule #1843(a)(d) (Medication, Drugs and Other Substances) and rule #1844(c)(1) (Authorized Medication, Phenylbutazone, in excess of permitted level 2.69 ug/ml Class 4).

z. **July 2, 2017**:

| Regulatory Authority: **California Horse Racing Board** | Breed: **Thoroughbred** |
|---|---|
| Date: **7/2/2017** | Fine: **$1,000.00** |
| Medication 1: **Phenylbutazone** | Medication 2: |
| Association: **SANTA ANITA PARK** | Suspension Start: |
| Horse: **Diamondsandpearls** | Suspension End: |
| Website Updated: **4/30/2019** | |

- Description -

Trainer ROBERT BAFFERT, who started the horse DIAMONDSANDPEARLS first place finisher in the second race at Santa Anita Park on July 2, 2017 is fined ONE THOUSAND DOLLARS($1,000.00)* pursuant to California Horse Racing Board rule #1887 (Trainer to Insure Condition of Horse) for violation of California Horse Racing Board rule #1843(a)(d) (Medication, Drugs and Other Substances) and rule #1844(c)(1) (Authorized Medication Phenylbutazone in excess of permitted level 3.19 ug/ml Class 4).

aa. **April 2018**: Justify, first place finisher in the Santa Anita Derby (GI) on April 7, 2018, tested positive for scopolamine sometime thereafter and before Kentucky Derby 144.[2] Justify's test indicated 300 nanograms per milliliter of scopolamine, far in excess of the limit in California of 75 nanograms per milliliter.

bb. **July 27, 2019**:

| Regulatory Authority: | California Horse Racing Board | | Breed: **Thoroughbred** |
|---|---|---|---|
| Date: **7/27/2019** | | | Fine: **$500.00** |
| Medication 1: **Phenylbutazone** | | | Medication 2: |
| Association: **DEL MAR** | | | Suspension Start: |
| Horse: **Cruel Intention** | | | Suspension End: |
| Website Updated: **11/27/2019** | | | |

- Description -

Trainer ROBERT BAFFERT, who started the horse CRUEL INTENTION, third place finisher in the third race at Del Mar Race Track on July 27, 2019, is fined FIVE HUNDRED DOLLARS ($500.00) pursuant to #1887 (Trainer or Owner to Insure Condition of Horse) for violation of California Horse Racing Board rule #1843(a)(b)(d) (Medication, Drugs and Other Substances), for violation of #1843.1 (Prohibited Drug Substances ? Phenylbutazone (Class 4).

cc. **August 3, 2019**:

| Regulatory Authority: | California Horse Racing Board | | Breed: **Thoroughbred** |
|---|---|---|---|
| Date: **8/3/2019** | | | Fine: **$1,500.00** |
| Medication 1: **Phenylbutazone** | | | Medication 2: |
| Association: **DEL MAR** | | | Suspension Start: |
| Horse: **Eclair** | | | Suspension End: |
| Website Updated: **11/27/2019** | | | |

- Description -

Trainer ROBERT BAFFERT, who started the horse ECLAIR, fourth place finisher in the first race at Del Mar Race Track on August 3, 2019, is fined ONE THOUSAND FIVE HUNDRED DOLLARS ($1,500.00)* pursuant to #1887 (Trainer or Owner to Insure Condition of Horse) for violation of California Horse Racing Board rule #1843(a)(b)(d) (Medication, Drugs and Other Substances), for violation of #1843.1 (Prohibited Drug Substances ? Phenylbutazone (Class 4) second offense in 365 days).

---

[2] Joe Drape, *Justify Failed a Drug Test Before Winning a Triple Crown*, New York Times, Sept. 11, 2019; https://www.nytimes.com/2019/09/11/sports/horse-racing/justify-drug-test-triple-crown-kentucky-derby.html (last visited on May 12, 2021).

dd. **May 2, 2020**: Gamine, first place finisher in an allowance-level race at Oaklawn Park, and Charlatan, first place finisher of a division of the Arkansas Derby (GI), tested positive for lidocaine, a local anesthetic.[3] Gamine tested more than nine times above the threshold set by Arkansas law and regulations, and Charlatan tested more than twice above the threshold.

ee. **July 25, 2020**:

| Regulatory Authority: **California Horse Racing Board** | | Breed: **Thoroughbred** |
|---|---|---|
| Date: **7/25/2020** | | Fine: **$2,500.00** |
| Medication 1: **Dextromethorphan** | | Medication 2: |
| Association: **DEL MAR** | | Suspension Start: |
| Horse: **Merneith** | | Suspension End: |
| Website Updated: **1/11/2021** | | |

- Description -

Pursuant to California Horse Racing Board rule #1887 (Trainer or Owner to Insure Condition of Horse), trainer BOB BAFFERT, who started the horse "Merneith", the second place finisher in the fourth race at Del Mar Race Track on July 25, 2020, is fined TWO THOUSAND FIVE HUNDRED DOLLARS ($2,500.00)* for violation of California Horse Racing Board rule #1843 (a &d) (Medication, Drugs, and Other Substances) and #1843.1 (a) (Prohibited Drug Substances- Dextromethorphan 5 ng/ml-class 4).

ff. **September 4, 2020**:

| Regulatory Authority: **Kentucky Horse Racing Commission** | | Breed: **Thoroughbred** |
|---|---|---|
| Date: **9/4/2020** | | Fine: **$1,500.00** |
| Medication 1: **Betamethasone** | | Medication 2: |
| Association: **TURFWAY PARK** | | Suspension Start: |
| Horse: **Gamine** | | Suspension End: |
| Website Updated: **3/10/2021** | | |

- Description -

sample number E377808    fined $1500 and Gamine is disqualified and all purse money is forfeited

---

[3] Frank Angst, *Baffert Suspended, Horses DQ'ed After Drug Positives*, Bloodhorse, July 15, 2020; https://www.bloodhorse.com/horse-racing/articles/242346/baffert-suspended-horses-dqd-after-drug-positives (last visited May 12, 2021).

8

11.     Kentucky follows, maintains and applies the absolute insurer rule for trainers of Thoroughbred horses. 810 KAR 4:100 Sec. 3(1) and (2)(d).

12.     Under the absolute insurer rule, "a licensed trainer shall bear primary responsibility for the proper care, health, training condition, safety, **and protection against the administration of prohibited drugs or medication** of horses in his or her charge." 810 KAR 4:100 Sec. 3(1) (emphasis added).

13.     Under the absolute insurer rule, a licensed trainer "shall bear primary responsibility for horses he or she enters as to. . .the. . .**absence of prohibited drugs or medications**. . . ." 810 KAR 4:100 Sec. 2(d) (emphasis added).

### B. Defendant CDI's Operations and Internal Rules and Kentucky Horse Racing Laws and Regulations

14.     Defendant CDI owns and operates Churchill Downs Racetrack in Louisville, Kentucky.

15.     Churchill Downs Racetrack is The World's Most Legendary Racetrack® and conducts Thoroughbred horse racing, including the Kentucky Derby.[4]

16.     The Kentucky Derby "is a top rank, Grade I stakes race for 3 year old Thoroughbred horses."[5]

17.     According to www.kentuckyderby.com:

The Kentucky Derby takes place on the first Saturday in May every year, and typically draws a crowd of 155,000 people. It is the longest continually held sporting event in America, and it is one of the most prestigious horse races in the world. Often called "The Most Exciting Two Minutes in Sports", the Kentucky Derby receives this nickname from the approximate length of time it takes the winner to run from the starting gate to the finish line. The

---

[4] https://www.churchilldowns.com/visit/about/churchill-downs/ (last visited May 12, 2021).
[5] https://www.kentuckyderby.com/history/the-race (last visited May 12, 2021).

> Kentucky Derby is the first race within the Triple Crown of
> Thoroughbred Racing, where it is followed by the Preakness
> Stakes race and the Belmont Stakes race.[6]

18.     The Kentucky Oaks is a Grade I stakes race for 3 year old female Thoroughbred horses.

19.     The Kentucky Oaks is Defendant CDI's second most valuable, important and prestigious race at Churchill Downs Racetrack, behind only the Kentucky Derby.

20.     In conducting Thoroughbred horse racing, Defendant CDI publishes a Condition Book.[7] The Condition Book contains proposed races for each scheduled day of racing for the track meet. Each potential race contains conditions a horse must meet in order to be eligible to compete in the proposed race.

21.     In order to compete in any of the proposed races in the Condition Book, the owner and/or trainer of a horse must submit an entry to Defendant CDI by a certain date and time. 810 KAR 4:030 Sec. 3 and 7.

22.     Kentucky Administrative Regulations for Thoroughbred horse racing clearly provide that "[e]ntries or subscriptions for any horse. . .may be refused or cancelled by the association without notice or reason given." 810 KAR 4:030 Sec. 2. Kentucky law defines an "association" to include a racetrack. KRS 230.210(5); KRS 230.300.

23.     Defendant CDI is an association as defined by Kentucky law.

24.     Defendant CDI makes it clear to owners and trainers of horses wishing to compete in its races that it retains the absolute right of refusal on an entry for any reason:

---

[6] *Id.*
[7] https://www.churchilldowns.com/horsemen/racing/condition-book/ (last visited May 12, 2021).

# CONDITIONS

GENERAL: Entries to any race are received only upon the condition that the Applicant agrees to and will comply with the rules and regulations governing Thoroughbred horse races adopted by the Kentucky Horse Racing Commission (the "KHRC") and the rules and regulations of Churchill Downs Incorporated ("Churchill") (including these conditions) and will comply with and abide by any decision of the state racing officials and/or the Officers of Churchill regarding the interpretation and application of such rules and regulations. Applicant consents and agrees to all provisions of Churchill's current application and/or agreements regarding the use of stall space, the terms of which are specifically incorporated herein by reference, and shall execute all such applications and/or agreements before bringing any horse upon Churchill's grounds. In making this application to participate in thoroughbred racing, Applicant agrees and consents to Churchill and/or its agents making an investigation of Applicant whereby information may be requested from third parties as to character, general reputation, personal characteristics, mode of living, or such other information as may be relevant to the Applicant's integrity as a racing participant. Churchill reserves the right to cancel any race, without notice, at any time prior to the actual running thereof, without liability except for the return of all fees as required by the rules of racing. Churchill reserves the right to make all decisions regarding preferences and conditions and its decision shall be final. Nominations are received only with the understanding that Churchill reserves the right, in its sole and absolute discretion to refuse, cancel or revoke any nomination, entry or stall application or the transfer thereof and reserves the right to deny the right to start in a race without notice to the Applicant and for any reason, including but not limited to the Applicant's failure to fully perform or abide by all provisions and conditions hereof. [8]

      25.     Thus, Defendant CDI makes the choice, and has the final say, to accept or refuse entries to any of its proposed races from those submitting entries or their horses to compete in the races, including the 147th running of the Kentucky Derby.

      26.     On or about April 27, 2021, Defendant CDI accepted entries for the 147th running of the Kentucky Derby.[9]

      27.     Defendants BBRI and Baffert submitted an entry for Medina Spirit to run in the 147th running of the Kentucky Derby.

---

[8] *Id.* at p. 34. "'Applicant' shall mean and include the owners, trainers, jockeys of the horse being entered. . . ." *Id.* at p. 35.
[9] *Id.* at p. 56.

28.     Defendant CDI knew of Defendants BBRI and Baffert's history of medication violations prior to the submission of the entry of Medina Spirit into the 147th running of the Kentucky Derby.

29.     Most significantly, Defendant CDI knew that the Kentucky Horse Racing Commission, less than two months prior to the 147th running of the Kentucky Derby, disqualified Defendants BBRI and Baffert trainee Gamine from the 2020 running of the Kentucky Oaks at Churchill Downs Racetrack due to a positive test for betamethasone.

30.     Under its own rules and pursuant to Kentucky law and regulations, Defendant CDI could have refused the entry of Medina Spirit into the 147th running of the Kentucky Derby.

31.     Indeed, on May 9, 2021, Defendant CDI exercised its right under its own rules and Kentucky regulations governing Thoroughbred horse racing, and announced its refusal to accept entries from Defendants BBRI and Baffert:

### Churchill Downs' Statement in Response to Medina Spirit's Post-Race Test Result Allegations

**LOUISVILLE, KY. (Sunday, May 9, 2021)** – It is our understanding that Kentucky Derby winner Medina Spirit's post-race blood sample indicated a violation of the Commonwealth of Kentucky's equine medication protocols. The connections of Medina Spirit have the right to request a test of a split sample and we understand they intend to do so. To be clear, if the findings are upheld, Medina Spirit's results in the Kentucky Derby will be invalidated and Mandaloun will be declared the winner.

Failure to comply with the rules and medication protocols jeopardizes the safety of the horses and jockeys, the integrity of our sport and the reputation of the Kentucky Derby and all who participate. Churchill Downs will not tolerate it. Given the seriousness of the alleged offense, Churchill Downs will immediately suspend Bob Baffert, the trainer of Medina Spirit, from entering any horses at Churchill Downs Racetrack. We will await the conclusion of the Kentucky Horse Racing Commissions' investigation before taking further steps.

32.     Despite its knowledge of Defendants BBRI and Baffert's history of medication violations, which, in turn, results in ineligible horses competing in races, Defendant CDI made the choice to accept the entry of Medina Spirit into the 147th running of the Kentucky Derby.

**C. Medina Spirit, Betamethasone and the 147th running of the Kentucky Derby**

33.     Defendants BBRI and Baffert train the Thoroughbred horse Medina Spirit.

34.     Medina Spirit competed in the Santa Anita Derby on April 3, 2021.

35.     Defendants BBRI and Baffert initially denied administering betamethasone to Medina Spirit.

36.     Subsequent to the denial, according to Defendants BBRI and Baffert, following the Santa Anita Derby, Medina Spirit received betamethasone in treatment and/or therapy up until the day before the 147th running of the Kentucky Derby.

37.     Betamethasone is a corticosteroid used to treat inflammation in horses.

38.     The Kentucky Horse Racing Commission Uniform Drug, Medication, and Substance Classification Schedule lists betamethasone as a Class C drug. 810 KAR 8:020 Sec. 1; KHRC 8-020-1.

39.     Betamethasone is legal under Kentucky law and regulations for therapeutic purposes. However, Class C drugs, like betamethasone, have the potential to enhance the performance of Thoroughbred horses in races as well act as a masking agent of inflammation, lameness and pain, thus jeopardizing the safety of the horse and any rider.

40.     Kentucky law and regulations forbid any amount of betamethasone in Thoroughbred horses on race day because of its effects as a performance enhancer and masking agent and for the safety of the horse and any rider.

41.     Kentucky horse racing regulations specifically provide that:

   a.  "A corticosteroid shall not be administered intra-articularly within fourteen (14) days before post time for the race in which the horse is entered." 810 KAR 8:010 Sec. 23(1).

   b.  "The presence of a detectable concentration of more than one (1) corticosteroid in a post-race sample of blood, urine, or any combination of blood and urine shall constitute a violation of this section." 810 KAR 8:010 Sec. 23(2). This subsection makes no distinction regarding how a corticosteroid, such as betamethasone, enters a horse's body.

42.     Medina Spirit raced in the 147th running of the Kentucky Derby crossing the finish line first ahead of entrants Mandaloun, Hot Rod Charlie, Essential Quality, O Besos and Midnight Bourbon, among others, in that order.

43.     Following the race, Medina Spirit submitted to a mandatory post-race blood sample test.

44.     Medina Spirit's post-race blood sample tested positive for betamethasone, which constitutes a violation of Kentucky laws and regulations governing horse racing.

45.     Kentucky horse racing regulations allow an owner or trainer to request that a split sample be tested by a split sample laboratory approved by the Kentucky Horse Racing Commission. 810 KAR 8:010 Sec. 11(3).

46.     "'Split sample' means the split sample portion of the biologic specimen taken under the supervision of the commission veterinarian to be tested by the split sample laboratory." 810 KAR 8:010 Sec. 1(7).

47.     "'Split sample laboratory' means the laboratory approved by the commission to test the split sample portion of the biologic specimen from horses taken under the supervision of the commission veterinarian." 810 KAR 8:010 Sec. 1(8).

48.     Defendants BBRI and Baffert requested a split sample be tested by a split sample laboratory approved by the Kentucky Horse Racing Commission as permitted by Kentucky horse racing regulations.

49.     Medina Spirit's post-race blood split sample again tested positive for betamethasone, and this time at a higher concentration than found in the first test result. Thus, under Kentucky horse racing regulations, Medina Spirit's post-race blood sample testing resulted in a Class C drug violation.

50.     Kentucky horse racing regulations provide that the penalty for a Class C drug violation is the disqualification of the horse from the race. 810 KAR 8:030 Sec. 4(3).

51.     Because a positive test for any amount of betamethasone results in a disqualification of the horse from the race under Kentucky laws and regulations, Defendants BBRI and Baffert entered an unqualified and ineligible horse in the 147th running of the Kentucky Derby.

52.     When a disqualification due to a medication violation occurs, all horses placing behind the disqualified horse are promoted a placing and the disqualified horse is demoted to last place. Therefore, the new, complete and official order of finish of the

15

first five horses of the 147th running of the Kentucky Derby is, with their program

numbers, Mandaloun (7), Hot Rod Charlie (9), Essential Quality (14), O Besos (6) and

Midnight Bourbon (10), in that order.

53.     On May 9, 2021, Defendant CDI acknowledged this by stating as follows:

## Churchill Downs' Statement in Response to
## Medina Spirit's Post-Race Test Result Allegations

**LOUISVILLE, KY. (Sunday, May 9, 2021)** – It is our understanding that Kentucky Derby winner
Medina Spirit's post-race blood sample indicated a violation of the Commonwealth of Kentucky's equine
medication protocols. The connections of Medina Spirit have the right to request a test of a split sample
and we understand they intend to do so. To be clear, if the findings are upheld, Medina Spirit's results in
the Kentucky Derby will be invalidated and Mandaloun will be declared the winner.

### D.  Defendant CDI's Lack of Adequate Testing System

54.     Nothing in Kentucky law or regulations prevents Defendant CDI from

implementing pre-race testing of Thoroughbred horses nominated to compete in races it

conducts.

55.     Kentucky laws and regulations mandate out-of-competition testing of

Thoroughbred horses, which occurs prior to a race.

56.     The Kentucky Horse Racing Commission bears responsibility for collecting

out-of-competition specimens.

57.     Kentucky laws and regulations allow licensed associations, such as

Defendant CDI, to request and receive split samples of specimens collected by the

Kentucky Horse Racing Commission prior to the races Defendant CDI conducts.

58.     Collecting samples of specimens, testing them and getting the results all

within just a matter of days before a race is possible. In fact, the Maryland Racing

Commission did just that prior to the Preakness Stakes, held on May 15, 2021, regarding Medina Spirit's entry into that race.[10]

59.     Defendant CDI failed to have any system in place for requesting, receiving and testing split samples of specimens and receiving the results prior to races it conducts, including the 147th running of the Kentucky Derby.

60.     Defendant CDI failed to have any system in place for requesting, receiving and testing samples of specimens on its own, and separate from the Kentucky Horse Racing Commission, and receiving the results prior to races it conducts, including the 147th running of the Kentucky Derby.

61.     If Defendant CDI had a system in place for requesting, receiving and testing split samples of specimens and receiving the results prior to races it conducts, including the 147th running of the Kentucky Derby, it would have discovered Medina Spirit's ineligibility, resulting in his scratch from the race.

62.      If Defendant CDI had a system in place for requesting, receiving and testing split samples of specimens on its own, and separate from the Kentucky Horse Racing Commission, and receiving the results prior to races it conducts, including the 147th running of the Kentucky Derby, it would have discovered Medina Spirit's ineligibility, resulting in his scratch from the race.

63.     Thus, allowing an ineligible horse to race is completely foreseeable and preventable.

_____

[10] HRN Staff, *Medina Spirit to run in Preakness after agreement reached*, May 11, 2021; https://www.horseracingnation.com/news/Medina_Spirit_to_run_in_Preakness_after_agreement_reached _123?utm_source=ActiveCampaign&utm_medium=email&utm_content=Preakness+Post+Positions%2C+ ML+Odds+%2F+Baffert+Horses+Allowed+%2F+Drug+Culprit+Found%3F&utm_campaign=HRN+Newsle tter+05-11-2021 (last visited on May 13, 2021).

### E. Pari-mutuel Wagering, Racing Stewards and the Results of the 147th Running of the Kentucky Derby

64.    Defendant CDI offers pari-mutuel wagering to the public on the races it conducts at Churchill Downs Racetrack, including the 147th running of the Kentucky Derby.

65.    Pari-mutuel wagering in Thoroughbred horse racing consists of a racetrack association accepting, or booking, a number of different types of wagers (e.g., Win, Place, Show, Exacta, Trifecta, Superfecta, etc.). These different types of wagers each have their own separate "pool" where the money collects. For each wager, the racetrack association will typically print a ticket that acts as a receipt indicating the bettor's wager. The racetrack association collects a percentage of each pool as its fee for booking the bet, known as the takeout. After the race is run and declared official, the racetrack association divides the money in each pool, after the takeout, by the number of winning tickets to produce payouts - ((total amount in pool – takeout percentage) / winning tickets). Racetrack associations typically publish payouts after the race is official in base bet denominations ranging from $.10 - $2.00. Bettors then exchange their winning ticket for the money due to them – known as settlement of wagers.

66.    The total amount in a pool, on a race, or in a day, is known as the "handle."

67.    Defendant CDI accepted the following wagers on the 147th running of the Kentucky Derby:

    a.  Win;

    b.  Place;

18

c.  Show;

d.  Exacta;

e.  Trifecta;

f.  Superfecta;

g.  Super High Five;

h.  Daily Double – multiple rolling;

i.  Pick 3 – multiple rolling;

j.  Pick 4 - multiple;

k.  Pick 5 - multiple;

l.  Pick 6;

m. Pick 6 Jackpot; and

n.  Future Wager – multiple.

68.     Defendant CDI handled $159,278,366 across all pools on the 147th running of the Kentucky Derby[11]:

| Pgm | Horse | Win | Place | Show | Wager Type | Winning Numbers | Payoff | Pool |
|---|---|---|---|---|---|---|---|---|
| | **Total WPS Pool: $69,432,825** | | | | | | | |
| 8 | Medina Spirit | 26.20 | 12.00 | 7.60 | $0.50 Pick 3 | 4-3-8 (3 correct) | 73.15 | 1,304,665 |
| 7 | Mandaloun | | 23.00 | 13.40 | $0.50 Pick 3 | 4-5-8 (3 correct) | 163.05 | 0 |
| 9 | Hot Rod Charlie | | | 5.20 | $0.50 Pick 3 | OAKS/FRSTR/DERBY 10-3-8 (3 correct) | 51.85 | 0 |
| | | | | | $0.50 Pick 3 | OAKS/FRSTR/DERBY 10-5-8 (3 correct) | 109.10 | 631,903 |
| | | | | | $0.50 Pick 4 | 5-4-3/5-8 (4 correct) | 708.15 | 3,209,825 |
| | | | | | $0.50 Pick 5 | 2/3-5-4-3/5-8 (5 correct) | 2,974.85 | 3,425,122 |
| | | | | | $2.00 Pick 6 | OAKS/DERBY 2-7-10-4-4-3/5-8 (6 correct) | 2,143.80 | 640,315 |
| | | | | | $2.00 Pick 6 | OAKS/DERBY 2-7-10-4-4-3/5-8 (5 correct) | 22.20 | 0 |
| | | | | | $0.20 Pick 6 Jackpot | 4-2/3-5-4-3/5-8 (6 correct) | 1,363.90 | 3,584,747 |
| | | | | | $1.00 Daily Double | 3-8 | 26.40 | 1,223,340 |
| | | | | | $1.00 Daily Double | 5-8 | 62.60 | 0 |
| | | | | | $1.00 Daily Double | OAKS/DERBY 10-8 | 47.90 | 2,792,122 |
| | | | | | $2.00 Exacta | 8-7 | 503.60 | 22,218,094 |
| | | | | | $2.00 Future Wager | EXACTA POOL 1 - 24-7 | 123.80 | 57,347 |
| | | | | | $2.00 Future Wager | EXACTA POOL 2 - 14-13 | 3,254.46 | 81,267 |
| | | | | | $2.00 Future Wager | EXACTA POOL 3 - 15-14 | 1,543.00 | 110,590 |
| | | | | | $2.00 Future Wager | EXACTA POOL 4 - 15-14 | 859.80 | 98,444 |
| | | | | | $2.00 Future Wager | EXACTA POOL 5 - 15-14 | 1,774.00 | 127,555 |
| | | | | | $2.00 Future Wager | POOL 1 - 24 | 4.60 | 191,984 |
| | | | | | $2.00 Future Wager | POOL 2 - 14 | 51.40 | 240,768 |
| | | | | | $2.00 Future Wager | POOL 3 - 15 | 53.00 | 278,397 |
| | | | | | $2.00 Future Wager | POOL 4 - 15 | 81.00 | 231,632 |
| | | | | | $2.00 Future Wager | POOL 5 - 15 | 28.80 | 242,140 |
| | | | | | $2.00 Future Wager | SIRE EXACTA 1 - 24-12 | 60.40 | 14,298 |
| | | | | | $2.00 Future Wager | SIRE POOL 1 - 24 | 12.00 | 33,264 |
| | | | | | $1.00 Superfecta | 8-7-9-14 | 9,456.40 | 13,933,415 |
| | | | | | $1.00 Super High Five | 8-7-9-14-6 | 296,769.60 | 763,496 |
| | | | | | $0.50 Trifecta | 8-7-9 | 848.45 | 30,501,566 |

69.     Because of the presence of betamethasone in Medina Spirit's system, he lacked eligibility and qualification to race in the 147th running of the Kentucky Derby and should never been entered or accepted as an entry.

70.     Medina Spirit lacked eligibility and qualification to enter the 147th running of the Kentucky Derby due to the presence of betamethasone in his system on May 1, 2021.

71.     Pursuant to Kentucky law and horse racing regulations, Medina Spirit was disqualified from entering and competing in the 147th running of the Kentucky Derby.

---

[11] https://www.equibase.com/premium/chartEmb.cfm?track=CD&raceDate=05/01/2021&cy=USA&rn=12 (last visited on May 12, 2021). The number includes Daily Double, Pick 3, Pick 4 and Pick 5 pools ending in races 13 and 14. The chart reflects wagers ending with the Kentucky Derby, which totals $155,369,121.

72.     Defendant CDI incorrectly and erroneously accepted Medina Spirit as an entrant and starter in the 147th running of the Kentucky Derby.

73.     Medina Spirt crossed the finish line first in the 147th running of the Kentucky Derby.

74.     Kentucky horse racing regulations provide that the Kentucky Horse Racing Commission "shall employ and compensate two (2) of the three (3) stewards for each race meeting, including the chief steward." 810 KAR 2:040 Sec. 3(1).

75.     Kentucky horse racing regulations further provide that "[a] racing association[, such as Defendant CDI,] shall nominate one (1) of the three (3) stewards for each race meeting for approval by the commission and shall be responsible for that person's compensation as a steward." 810 KAR 2:040 Sec. 3(2). Thus, one of the three stewards at Defendant CDI's race meeting, and for the 147th running of the Kentucky Derby, qualified as its employee, ostensible employee, agent or ostensible agent.

76.     Racing stewards' duties and responsibilities include "caus[ing] the 'official' sign to be posted after determining the official order of finish for purposes of pari-mutuel payoff." 810 KAR 2:040 Sec. 5(9).

77.     Defendant CDI, by and through its employee, ostensible employee, agent or ostensible agent, declared and/or accepted Medina Spirit as the official first-place finisher in the 147th running of the Kentucky Derby.

78.     Defendant CDI then calculated and paid wagers based on Medina Spirit finishing first in the 147th running of the Kentucky Derby.

79.     Defendant CDI, by and through its employee, ostensible employee, agent or ostensible agent, erred in declaring and/or accepting Medina Spirit as the first-place

21

finisher of the 147th running of the Kentucky Derby and proceeded to calculate the payout of wagers on the race based on Medina Spirit finishing first in the 147th running of the Kentucky Derby.

80.     Due to its error, by and through its employee, ostensible employee, agent or ostensible agent, in declaring and/or accepting an ineligible horse as the official first-place finisher, Defendant CDI incorrectly calculated the payouts and incorrectly settled losing wagers.

81.     Defendant CDI should have calculated the payouts based on the following order of the first five finishers in the 147th running of the Kentucky Derby: Mandaloun (7), Hot Rod Charlie (9), Essential Quality (14), O Besos (6) and Midnight Bourbon (10).

82.     Defendant CDI should have settled any and all of the wagers it booked based on the following order of the first five finishers in the 147th running of the Kentucky Derby: Mandaloun (7), Hot Rod Charlie (9), Essential Quality (14), O Besos (6) and Midnight Bourbon (10).

83.     Alternatively, and even if Defendant CDI acted appropriately in calculating and distributing the payouts based on Medina Spirit finishing first the 147th running of the Kentucky Derby, Medina Spirit's positive test for betamethasone resulted in his ineligibility and disqualification as the first-place finisher of the 147th running of the Kentucky Derby under Kentucky law and horse racing regulations.

84.     Defendant CDI's actions, inactions and failures directly led to an ineligible horse entering and competing in the 147th running of the Kentucky Derby, its disqualification pursuant to Kentucky law and horse racing regulations and the new,

22

complete and official order of finish of the first five horses of the 147th running of the Kentucky Derby.

85.     As a result of the ineligibility and disqualification, Medina Spirit is demoted to last place and all horses placing behind him are promoted a placing. Therefore, the new, complete and official order of finish of the first five horses of the 147th running of the Kentucky Derby is, with their program numbers, Mandaloun (7), Hot Rod Charlie (9), Essential Quality (14), O Besos (6) and Midnight Bourbon (10), in that order.

86.     Defendant CDI has not settled any of the wagers it booked based on the new, complete and official order of finish of the first five horses of the 147th running of the Kentucky Derby or offered any refunds.

### F.  Anthony Mattera and Horseplayers

87.     Mr. Mattera is a horseplayer.

88.     Horseplayers approach Thoroughbred wagering as a game of skill.

89.     Thoroughbred wagering is a market, much the same as a stock or commodities market.

90.     Horseplayers, like participants in other markets, retrieve, review and analyze data in an attempt to determine the outcome of some thing or some event in the future, in this case the results of a horse race.

91.     Horseplayers place wagers on their predictions about the outcome of races, much like a person purchases a stock.

92.     Many horseplayers use sophisticated technology that rivals that of any Wall Street investor.

93.     Many horseplayers develop and utilize computer models to select what wagers they place.[12]

94.     Racetrack associations, like Churchill Downs Racetrack, attempt to entice owners and trainers of Thoroughbred horses to enter their races with purse money. Defendant CDI publishes the amount of purse money available for owners and trainers to attempt to earn in each of its races in its Condition Book.

95.     Defendant CDI distributes purse money to entrants of its races according to their finishing placement.

96.     In turn, Defendant CDI handles wagering on its races, and the more entrants it receives, the bigger handle it can expect.

97.     Defendant CDI funds its purses through wagering on its races.

98.     Thus, wagers by horseplayers fund the purse money that owners and trainers of Thoroughbred horses attempt to earn.

99.     Additionally, wagers by horseplayers account for a racetrack association's revenue through the takeout of the wagers handled.

100.    Despite their important place in the ecosystem of Thoroughbred horse racing, Kentucky laws and regulations specific to Thoroughbred horse racing and pari-mutuel wagering provide almost no protection to horseplayers while affording racetrack associations, owners and trainers with all-encompassing protections.

101.    For example, after declaration of a race as official on the day of a race, if a disqualification of an entrant occurs, Kentucky laws and regulations specific to

---

[12] Kit Chellel, *The Gambler Who Cracked the Horse-Racing Code*, Bloomberg Businessweek, May 3, 2018; https://www.bloomberg.com/news/features/2018-05-03/the-gambler-who-cracked-the-horse-racing-code (last visited May 14, 2021).

Thoroughbred horse racing and pari-mutuel wagering provide no recourse for horseplayers who hold winning wagers but for the disqualification. Kentucky law and regulations specific to Thoroughbred horse racing and pari-mutuel wagering do not require racetrack associations to reverse payouts and/or redistribute money based on the new, official result.

102.    After declaration of a race as official on the day of the race, if a disqualification of an entrant occurs, Kentucky laws and regulations specific to Thoroughbred horse racing and pari-mutuel wagering *do* allow for, and mandate, the redistribution of purse money to the owners of the entrants. Thus, on race day, races are really only official as it concerns horseplayers who wager, but not for trainers and owners racing for purse money.

103.    Kentucky laws and regulations specific to Thoroughbred horse racing and pari-mutuel wagering provide for precisely no penalties, sanctions or consequences for racetrack associations, including Defendant CDI, who accept entries from trainers and/or owners it knows, or should know, enter unqualified and ineligible horses in races.

104.    Racetrack associations, including Defendant CDI, continue to accept entries of Thoroughbred horses from trainers and/or owners it knows, or should know, enter unqualified and ineligible horses in races.

105.    Without any downside to their actions, racetrack associations, including Defendant CDI, can accept entries of unqualified and ineligible horses with impunity from Kentucky laws and regulations specific to Thoroughbred horse racing and pari-mutuel wagering, escape any consequences for their actions, or inactions, and leave

horseplayers with no recourse under Kentucky laws and regulations specific to Thoroughbred horse racing and pari-mutuel wagering.

106.   However, racetrack associations, including Defendant CDI, are subject to Kentucky laws other than those just specific to Thoroughbred horse racing and pari-mutuel wagering, such as Kentucky common law.

107.   Mr. Mattera was born in Atlantic City, New Jersey and has been around Thoroughbred horse racing his entire life. He currently works as a legal consultant in Florida.

108.   Mr. Mattera uses a very sophisticated computer program along with many different commercial services in analyzing data and selecting wagers to place on races.

109.   In 2017, Mr. Mattera won the Borgata season series handicapping challenge along with numerous other contest wins.

110.   Mr. Mattera has qualified for the National Horseplayers Championship (f/k/a the National Handicapping Championship) from 2017-2020.

111.   Mr. Mattera has contested the Breeders' Cup Betting Championship and most other major contests since 2018.

112.   Mr. Mattera attended the 147th running of the Kentucky Derby.

113.   Mr. Mattera, in partnership with others, placed the following winning wagers on the 147th running of the Kentucky Derby that remain unsettled:

    a.  $1,000 to Win;

    b.  Multiple Exactas;

    c.  Multiple Trifectas;

    d.  Multiple Superfectas;

26

  e. Multiple Pick 4s;

  f. Multiple Pick 5s;

  g. $.20 Pick 6; and

  h. $2 Two-day Pick 6.

114. Mr. Mattera's Win wager is reflected below:



115. Defendant CDI should settle any and all of the wagers it booked from Mr. Mattera based on the following order of the first five finishers in the 147th running of the Kentucky Derby: Mandaloun (7), Hot Rod Charlie (9), Essential Quality (14), O Besos (6) and Midnight Bourbon (10).

116. Mr. Mattera estimates that he, and his partners, should collect at least $1,000,000 in winnings.

117. Mr. Mattera does not seek a claw back or reversal of the pari-mutuel payments made by Defendant CDI to holders of incorrectly settled wagers.

118.   Mr. Mattera does not seek a pari-mutuel payout as defined and described in 810 KAR 6:020 and 810 KAR 6:030E.

119.   Mr. Mattera seeks damages under Kentucky law based on the pari-mutuel principles as defined and described in 810 KAR 6:020 and 810 KAR 6:030E when applied to and calculated upon the pools for the 147th running of the Kentucky Derby.

## **CLASS ALLEGATIONS**

120.   The Plaintiff incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows:

121.   The Plaintiff Class includes all persons similarly situated to Plaintiff, as more fully described below, who placed winning pari-mutuel bets on the 147th running of the Kentucky Derby based on the new, complete and official order of finish of the first five horses, and who had not filed a civil action and/or do not have a civil action continuously pending as of May 14, 2021 asserting the same claims against the same Defendants as asserted herein.

122.   Plaintiff seeks to represent the following class of individuals:

- All persons who placed pari-mutuel bets on the Kentucky Derby that based on the new, complete and official order of finish of the first five horses of the 147th running of the Kentucky Derby.

- Excluded from the Class are those persons or representatives of estates that have filed and have a continuously pending a civil action in any state or federal court as of May 14, 2021 that asserts the same claims against the same Defendants as asserted herein.

123.   Plaintiffs, and all others similarly situated, are entitled to have this case maintained as a class action pursuant to the Federal Rules of Civil Procedure.

124.   The Plaintiff Class is so numerous that joinder of all persons is

impracticable and inefficient.

125.    There are common issues of law and fact applicable to the Plaintiff Class'
claims and Defendants' individual and collective liability thereunder. The same facts, the
same law, and the same issues are at issue—concerning the Defendants' individual and
collective negligence as described herein.

126.    Resolution of the common question(s) will advance resolution of the
Plaintiff Class' claims. Defendants' individual and collective conduct presents common
factual questions that predominate. As such, the Plaintiff Class is necessarily bound
together by the common factual questions relating to whether the Defendants' individual
and collective conduct violated Kentucky law.

127.    The Plaintiff Class' claims are typical. Each putative class member
experienced the same outcome and corresponding damages as the direct and
consequential result of the Defendants' individual and collective negligence as
described herein. The Plaintiff Class' claims are subject to the same facts, law and
defenses.

128.    The Plaintiff Class' interests are directly aligned amongst themselves and,
as such, they will fairly and adequately represent and protect the interests of the Class
members. Further, the Plaintiff Class has retained counsel experienced in the
prosecution of class action litigation who will adequately represent the interests of the
Plaintiff Class and its members. The Plaintiff Class further is unaware of any conflicts of
interests between the Plaintiffs and the absent Plaintiff Class members.

129.    The Plaintiff Class further have, or can acquire, adequate financial
resources to assure that the interests of Plaintiff Class members will be protected.

Further, the Plaintiff Class representative is knowledgeable concerning the subject matter of this action and will assist counsel in the prosecution of this litigation.

130.    The prosecution of the Plaintiff Class' claims on an individual ad hoc basis would create a substantial risk of inconsistent and/or varying legal outcomes that would establish incompatible standards of conduct. Similarly, such an ad hoc litigation process would create a further substantial risk of a single legal outcome that would, as a practical matter, be dispositive of other Plaintiff Class members, thereby substantially prejudicing their respective interests. Class certification would alleviate these issues and provide for an orderly and efficient resolution for all parties and the Court.

131.    Finally, the Plaintiff Class' claims present common questions of law and fact that predominate over all alleged questions affecting individual class members. The same facts and the same law will dictate the extent and the scope of the Defendants' individual and collective liability to the Plaintiff Class—thus making the procedural class action mechanism the fairest and, more importantly, efficient means for timely and expeditiously resolving the Plaintiff Class' claims.

132.    Given that Plaintiff Class is limited to individuals who placed winning pari-mutuel wagers on Kentucky Derby 147 based on the new, complete and official order of finish of the first five horses , and there is little interest in absent class members pursuing separate individual actions, hence the definition carve-out for the any persons that previously elected to pursue a civil action, the class action procedural mechanism is appropriate and a superior means of resolution.

30

## COUNT I – NEGLIGENCE
## (BAFFERT DEFENDANTS)

133.    The Plaintiff incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows:

134.    On and before May 1, 2021, Defendants BBRI and Baffert, individually, and/or by and through their agents, representatives, employees, vendors, ostensible agents, operators, owners, members, managers, officers and/or partners, were negligent in their care of Medina Spirit and his entry into the 147th running of the Kentucky Derby.

135.    As a direct and proximate result of Defendants' negligence, Mr. Mattera and the Plaintiff Class suffered legal injuries and damages in the form of unsettled pari-mutuel wagers.

136.    The actions, inactions, failures and omissions of Defendants BBRI and Baffert as described herein constitute intentional, reckless, malicious, wanton, grossly negligent, oppressive and/or fraudulent conduct and exhibited a reckless disregard for Mr. Mattera, the Plaintiff Class and other bettors wagering on 147th running of the Kentucky Derby.

137.    This conduct rises to a level that warrants the imposition of punitive damages pursuant to KRS 411.184 and 411.186.

## COUNT II – NEGLIGENCE (DEFENDANT CDI)

138.    The Plaintiff incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows:

139.    On or about May 1, 2021, Defendant CDI by and through its agents,

representatives, employees, vendors, ostensible agents, operators, owners, members, managers, officers and/or partners, were negligent in choosing to accept the entry of Medina Spirit for the 147th running of the Kentucky Derby from Defendants BBRI and Baffert and allowing Medina Spirit to race.

140.    Defendant CDI by and through its agents, representatives, employees, vendors, ostensible agents, operators, owners, members, managers, officers and/or partners, was negligent in failing to maintain an adequate system for detecting and scratching ineligible horses prior to them competing in races it conducts, including Medina Spirit and the 147th running of the Kentucky Derby.

141.    As a direct and proximate result of Defendant CDI's negligence, Mr. Mattera and the Plaintiff Class suffered legal injuries and damages in the form of unsettled pari-mutuel wagers.

142.    The actions, inactions, failures and omissions of Defendant CDI as described herein constitute intentional, reckless, malicious, wanton, grossly negligent, oppressive and/or fraudulent conduct and exhibited a reckless disregard for Mr. Mattera, the Plaintiff Class and other bettors wagering on the 147th running of the Kentucky Derby.

143.    This conduct rises to a level that warrants the imposition of punitive damages pursuant to KRS 411.184 and 411.186.

## COUNT III – KENTUCKY CONSUMER PROTECTION ACT VIOLATION (DEFENDANT CDI)

144.    The Plaintiff incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows:

145.   The Kentucky Consumer Protection Act, KRS 367.110, *et seq.*, was enacted upon the finding "that the public health, welfare and interest require a strong and effective consumer protection program to protect the public interest and the well-being of both the consumer public and the ethical sellers of goods and services. . . ." KRS 367.120.

146.   Defendant CDI conducts trade and/or commerce as defined in KRS 367.110 by advertising, offering and distributing wagers on Thoroughbred horse racing.

147.   KRS 367.170 prohibits unfair, false, misleading or deceptive acts and/or practices in the conduct of any trade or commerce, including any unconscionable activities.

148.   Defendant CDI's actions and practices as described in this Amended Complaint are unfair, false, misleading, deceptive and/or unconscionable, in violation of the Kentucky Consumer Protection Act.

149.   KRS 367.220(1) allows any person who suffers any ascertainable loss of money or property as a result of unfair, false, misleading or deceptive acts and/or practices to bring an action to recover actual damages and equitable relief.

150.   KRS 367.220(3) provides for attorney's fees and costs.

151.   As a direct and proximate result of Defendant CDI's violation of the Kentucky Consumer Protection Act, Mr. Mattera and the Plaintiff Class suffered ascertainable loss of money or property.

152.   As a result, Mr. Mattera and the Plaintiff Class are entitled to recover actual damages including, but not limited to:

    a.  Unsettled pari-mutuel wagers made by them based on the following

order of the first five finishers in the 147th running of the Kentucky

Derby: Mandaloun (7), Hot Rod Charlie (9), Essential Quality (14), O

Besos (6) and Midnight Bourbon (10), and based on the pari-mutuel

principles as defined and described in 810 KAR 6:020 and 810 KAR

6:030E when applied to and calculated upon the pools for the 147th

running of the Kentucky Derby; and

b.  Other equitable relief pursuant to the Kentucky Consumer Protection

Act.

153.   Mr. Mattera and the Plaintiff Class are further entitled to interest, attorney's fees and costs pursuant to the Kentucky Consumer Protection Act.

154.   KRS 367.220(1) specifically does not limit a person's right to seek punitive damages where appropriate.

155.   The actions, inactions, failures and omissions of Defendant CDI as described herein constitute intentional, reckless, malicious, wanton, grossly negligent, oppressive and/or fraudulent conduct and exhibited a reckless disregard for Mr. Mattera, the Plaintiff Class and other bettors wagering on 147th running of the Kentucky Derby.

156.   This conduct rises to a level that warrants the imposition of punitive damages pursuant to KRS 411.184 and 411.186.

### COUNT IV – UNJUST ENRICHMENT (DEFENDANT CDI)

157.   The Plaintiff incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows:

158.   Mr. Mattera and the Plaintiff Class conferred a benefit on Defendant CDI by making wagers on the 147th running of the Kentucky Derby.

34

159.   Defendant CDI appreciated the benefit by receiving the wagers and retaining the revenues derived from them.

160.   Retention of the money wagered and revenues derived constitutes an inequitable retention of the benefit without payment for its value.

161.   The remedy for unjust enrichment is restitution.

162.   Kentucky law entitles Mr. Mattera and the Plaintiff Class to seek restitution in the form restoration from Defendant CDI of the benefit conferred upon it.

163.   Kentucky law requires Defendant CDI to disgorge the wagers and revenues, including interest, and return the money wagered to Mr. Mattera and the Plaintiff Class.

164.   The actions, inactions, failures and omissions of Defendant CDI as described herein constitute intentional, reckless, malicious, wanton, grossly negligent, oppressive and/or fraudulent conduct and exhibited a reckless disregard for Mr. Mattera, the Plaintiff Class and other bettors on 147th running of the Kentucky Derby.

165.   This conduct rises to a level that warrants the imposition of punitive damages pursuant to KRS 411.184 and 411.186.

**COUNT V – PERMANENT INJUNCTIVE RELIEF (DEFENDANT CDI)**

166.   The Plaintiff incorporates by reference each of the paragraphs above as if fully set forth herein and further alleges as follows:

167.   Defendant CDI by and through its agents, representatives, employees, vendors, ostensible agents, operators, owners, members, managers, officers and/or partners, failed to maintain an adequate system for detecting and scratching ineligible horses prior to them competing in races it conducts.

35

168. Defendant CDI's actions and practices as described in this Complaint are unfair, false, misleading, deceptive and/or unconscionable, in violation of the Kentucky Consumer Protection Act.

169. Mr. Mattera seeks to permanently enjoin Defendant CDI in a final judgment from further conducting Thoroughbred horse racing as follows:

      a. Without an adequate system for detecting and scratching ineligible horses prior to them competing in races it conducts;

      b. Without enforcing its own internal rule to refuse entries to trainers and owners that it knows or should know enter unqualified and ineligible horses into Thoroughbred horse races;

      c. Creation of a fund to settle pari-mutuel wagers that become correct following the disqualification of a horse in its races;

      d. Maintenance and public disclosure of all veterinarian records of entrants in its races within 48 hours of the scheduled post time;

      e. Maintenance and public disclosure of records of medication violations of trainers who enter horses in its races within 48 hours of the scheduled post time; and

      f. Removal of forced arbitration provisions as it relates to wagering customers.

**WHEREFORE**, the Plaintiff, individually, and on behalf of those similarly situated, respectfully requests and prays for the following relief:

1.      The Court certify the Plaintiff's claims as a class action pursuant to the applicable Federal Rules of Civil Procedure, names Plaintiff as the Lead Class Plaintiff and appoint Plaintiff's undersigned counsel as Class Counsel;

2.      Judgment against the Defendants, jointly and severally, in an amount that will fully, justly, fairly and reasonably compensate Plaintiff and the Plaintiff Class for the harms suffered, losses incurred and damage caused by Defendants.

3.      Judgment against Defendants, jointly and severally, in an amount representing the payout of the winning pari-mutuel wagers as calculated on the new, complete and official order of finish of the first five horses of the 147th running of the Kentucky Derby;

4.      For a permanent injunction against Defendant CDI;

5.      For a trial by jury;

6.      For pre-judgment and post-judgment interest from the date of the damages incurred until paid;

7.      For costs herein expended;

8.      For the right to amend this Amended Complaint to add other claims and parties as the proof allows; and

9.      For all other necessary and proper relief to which Plaintiff and Plaintiff Class may be entitled.

Respectfully submitted,

**BAHE COOK CANTLEY & NEFZGER PLC**

/s/ William D. Nefzger_____
William D. Nefzger
The BCCN Building
1041 Goss Avenue
Louisville, Kentucky 40217
will@bccnlaw.com
(502) 587-2002 – Telephone
(502) 587-2006 – Facsimile
*Counsel for Plaintiff and Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 28, 2021, a true and correct copy of the foregoing was filed electronically with this Court via the ECF system. Notice of this filing will be sent by operation of the ECF system to all parties indicated on the electronic filing receipt.

/s/ William D. Nefzger_____
Counsel for Plaintiff and Putative Class